Mr. Justice Davis
delivered the opinion of the court:
This suit is based substantially on the following state of facts : In April, 1861, before the bombardment of Sumter, the confederate authorities at Charleston took forcible possession of the-steamer De Kalb, the property of one Dingle, against the ob *151 jection of tbe claimant, wlio bad charge of the boat, and used her for military purposes until the evacuation of Charleston, in February, 1805. During the continuance of this employment Dingle died, and in April, 1863, the boat was sold at administrator’s sale to the claimant, who, either as agent of the owner, or as owner himself, had the management of her from the beginning of the rebellion to the evacuation of Charleston. On the morning that this event happened, the boat, while lying at the wharf, was set on fire by the soldiers and turned adrift in the harbor. In this condition she was boarded by the claimant and the fire put out, but she drifted ashore on James Island, opposite Charleston, where she was when the United States forces took possession of the city.
On the occasion of this occupation, Tower, an engineer in the Navy, was placed in charge of the captured vessels and transport service. In a conversation between him and the claimant his attention was called to the steamer, and after making inquiries as to her condition, he directed the claimant to bring her to Charleston, and agreed to place her in the service of the United States. Accordingly, with the consent of Captain Moore, of the Quartermaster’s Department, he fixed $150 per day as the compensation for her use. Neither this sum nor any other was ever paid for this use, although the steamer was in the service of the Government until April, 1866, when, under an order from the Quartermaster-General’s Office, directing that vessels captured at Charleston should, when not required by the Quartermaster’s Department, be turned over to the agents of the Treasury, she was sold, and the proceeds paid into the. Treasury.
It is impossible to suppose that Tower would have made the contract he did with Slawson if he had been informed of the true state of affairs with reference to this steamer, and in the absence of proof on the subject,.it is a fair presumption that he was kept purposely in ignorance of the fact that she had been engaged constantly for nearly two years preceding the'occupation of - Charleston by the Federal forces, with the consent of the owner, in carrying on war against the United States. The object of Slawson in the transaction was obvious. If he could, through the instrumentality of Tower, get his steamer in the service of the Government at a stated compensation, he would have a chance, at least, to save her from being treated as prize *152 of war, and, if so, to obtain a remunerative price for her future employment. The circumstances at the time were favorable to the accomplishment of his object. The steamer was aground on a distant island, and Tower, although he had a right to suspect, could not certainly know the kind of use to which she had been previously put. If a credulous man, which would seem to be the case, he Could be easily imposed on, and in the nature of things it was not to be expected that any one would volunteer information to condemn the boat and Slawson’s conduct in connection with her.
It seems, however, that the mode adopted by Slawson to save his boat, and obtain compensation for her future use, if ingeniously contrived, did not accomplish his object, for the Government not only declined to pay anything for her use, but appropriated the boat itself as the lawful capture of the Army. This disposition of the property was strenuously resisted by Slaw-son, as appears by the statements of his petition. The Quartermaster’s Department not only refused on request to return the boat, but without notice to Slawson, and against his will, turned it over to the agent of the Treasury. Learning that this was done, he invoked, without success, the authority of the Secretary of the Treasury, in his behalf. This officer declined to restore the boat, on the ground that by the act of transfer to the Treasury Department the military power has.adjudged and determined the fact that the boat was the lawful capture or prize of the Army, and that he had not the power to revise that decision. She was accordingly sold, and the net proceeds paid into the Treasury. Slawson insists that he is entitled to these proceeds under the Act to provide for the collection of abandoned property, even if there had been a valid capture, but the proviso to the first section of this act expressly excludes from its operation property which, like this, has been used for the purpose of carrying on war against the United States. Congress did not think proper to become the trustee for the owner of a steamboat engaged, with his consent, id the military service of the enemy at the very time Charleston was taken. It will not do to say that Slawson acted under compulsion after his purchase. In the first place, the Court of Claims do not find this to be the case, and, besides, his conduct is inconsistent with any such theory, for he'purchased the steamer while under charter in the Confederate service, and necessarily must *153 have knowa that ho could not recover her from that service. It needs no argument to show that the purchaser under such circumstances consents that the boat shall be continued in the same business in which she had been engaged from the commencement of the rebellion. The claimant is, therefore, excluded from the benefit of the Captured and abandoned property Aci, and as the Court of Claims has no jurisdiction to try a case growing out of the appropriation of property by the Army or Navy, it follows that its judgment must be affirmed.